UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

—————————————————————

DANIEL A. HORAN,

                    Petitioner,

           v.                                              9:03-CV-0486
                                                             (LEK/DEP)
JAMES CONWAY, *Acting Superintendent,
Attica Corr. Facility*,

                    Respondent.

—————————————————————

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PETITIONER:**

OFFICE OF DENNIS B. SCHLENKER            DENNIS B. SCHLENKER, ESQ.
174 Washington Avenue
Albany, NY 12210

**FOR THE RESPONDENT:**

HON. ANDREW M. CUOMO                     NELSON SHEINGOLD, ESQ.
Office of the Attorney General           Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224-0341

**LAWRENCE E. KAHN, U.S. DISTRICT JUDGE**

**MEMORANDUM-DECISION AND ORDER**

**I. BACKGROUND**

*A. State Court Proceedings*

        According to the testimony adduced at trial, on the evening of June 10, 1999 at

approximately 8:40 p.m., Elizabeth DeWald, who at the time was nineteen years old, was

walking on State Route 23 toward her home in the Town of Ashland, County of Greene, New

York when she was hit by a car driven by Petitioner Daniel A. Horan.  See Transcript of Trial of

Daniel A. Horan (3/1/2000) ("Trial Tr.") at 242-43.  Steven Roe, an eyewitness to the incident,

testified that he had been driving in a westerly direction along Route 23 at approximately 8:40

p.m. on June 10th when he observed what subsequently proved to be Horan's car, a 1989 Blue

Ford Escort, in the rearview mirror of Roe's car.  Trial Tr. at 239-40.   When he noticed that the

driver of that car was speeding and driving erratically, Roe became concerned for his safety and

permitted Horan's car to pass Roe's automobile.  Trial Tr. at 240-41.  Some time after Roe

resumed driving, he observed DeWald walking on the shoulder of the highway approximately

two and one-half feet to the right of the white line separating the shoulder of the road from the

portion of the road on which automobiles are to travel.  Trial Tr. at 232, 241.  Roe then provided

the following account of what occurred next:

> Q.    What did you observe, what happened with [Horan's car]
>       after it passed you?
>
> A.    It still was going pretty fast.  I seen the brake lights come
>       on three times and by that time I was behind the second 35
>       [m.p.h.] sign and I seen the girl on the side of the road; and
>       I seen the car jerk over to the side of the road and strike the
>       girl.
>
>                          * * *
>
> Q.    ... And would you again describe what you saw the vehicle
>       do?
>
> A     I seen the car... it stayed pretty straight and at the last
>       second, I seen the car jerk to the right and struck the girl
>       and the girl flipped up over the top of the car.
>
> Q.    And what other observations did you make of the girl at
>       that point?

2

> A.      That she was just... she just ended up on the side of the road
> and I seen the car just keep going.

Trial Tr. at 232.  After Horan hit DeWald, he kept driving his automobile westward on Route 23 for a brief period of time, however he soon turned his car around and began traveling eastward on Route 23, eventually driving past DeWald's body.  Trial Tr. at 235-36.

Later that same day, law enforcement agents (who had been notified about the hit and run incident involving DeWald) observed Horan driving his car.  Trial Tr. at 237-38, 277.  After directing Horan to stop his vehicle, Sgt. James Fitzmaurice of the New York State Police told Horan to exit his vehicle and asked him to identify himself.  Trial Tr. at 280.  Horan refused to answer that question, however, and when asked by Sgt. Fitzmaurice why he refused to provide the requested information, Horan declared: "I just killed somebody."  Trial Tr. at 280.  Horan was then placed under arrest and taken to the State Police barracks.  Id.

After Horan arrived at the police station, he was advised of his Miranda rights[1] and thereafter provided a voluntary statement to New York State Police Investigator Stanley O'Dell. That statement, which was introduced as evidence against Horan at his trial, contains the following questions, which were posed by Investigator O'Dell, along with the corresponding answers provided by Horan:

> Q.      Danny, what can you tell me about the accident in Ashland
> tonight?
>
> A.      It wasn't an accident.  I did it intentionally.
>
> Q.      What did you do intentionally?
>
> A.      I drove my car into a woman[']s back.

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

Q.      Do you know who you hit?

A.      No

Q.      Why did you hit her?

A.      Because Chris [] and John took over the world.

Q.      Who owns the car?

A.      I do.

Q.      Was there anyone else in the car with you?

A.      No.

Q:      Have you been drinking alcohol today?

A.:     No.

Q.:     Have you taken any drugs today?

A.:     No.

* * *

Q:      Do you remember where the woman was when you hit her?

A.      She was up on the sidewalk.  The sidewalk between the firehouse and bridge.

Q.      Why did you drive up on the sidewalk?

A.      I'm trying to make the world be good.  I'm trying to make Chris and John be good.  So I have to be evil to turn everyone else good.

* * *

Q.      Who is Chris... ?

A.      He is a devil worshiper.  I don't know where he's from.  He lied to me.  I didn't realize but they brainwashed me.

Q.      Who is John?

4

A.      He lied to me.  He's a Greek.

Q.      Where did the woman hit on your car?

A.      She didn't hit the car.  I hit her.  She hit on the front right hand corner.

Q.      What did you do after you hit the woman?

A.      I ran.  I was going to commit suicide at the George Washington Bridge.  I was
        going to jump off.

Q.      Why were you going to jump off?

A.      Because I let Chris destroy the world.

Q.      What did you think would happen to the woman after you hit her?

A.      I think she died.  It doesn't matter what I wanted.  I'm a cold blooded killer.

Q.      Did you mean to kill her?

A.      Yes, I meant to kill her.  I wanted her dead.

Q.      Why did you want her dead?

A.      To save the world.

                                    * * *

Q.      Why did you kill her and not someone else?

A.      It was a random act of violence.

See Trial Tr. at pp. 286-88; see also Respondent's Appendix on Appeal ("Resp. App.") at RA1-3.

        As a result of the foregoing, a Greene County grand jury returned a three count indictment

against Horan on June 16, 1999.  See Indictment No. 99-074 (reproduced in Record at 4-6)

("Indictment").  In that accusatory instrument, Horan was charged with two counts of second

degree murder; the first count accused him of intentionally causing DeWald's death (in violation

of N.Y. Penal Law § 125.25(1)), while the second count charged that Horan, under circumstances

5

evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of danger to DeWald and caused her death (contrary to N.Y. Penal Law § 125.25(2)). See Indictment (Counts One, Two).  The third count in the indictment charged Horan with felony leaving the scene of a personal injury accident, in violation of Section 600(2)(b) of New York's Vehicle and Traffic Law.[2]

On June 11, 1999, the Office of the Green County Public Defender obtained a medical release executed by Horan that permitted that office to obtain and review, *inter alia*, mental hygiene records relating to Horan.  See, e.g., Resp. App. at RA 243.  Included within those records was a report prepared in March 1994 by the Bergen Pines County Hospital in which Horan was diagnosed as possessing "schizoaffective disorder."  See Record on Appeal ("Record") at 879-80.  Horan's counsel thereafter advised the prosecutor that Defendant intended to present psychiatric evidence in his defense to the charges brought against his client.  See Record at 30.  By Order dated August 11, 1999, Greene County Court Judge George J. Pulver Jr. directed psychiatrist Kevin Smith to evaluate Horan and to provide that court with a written report summarizing his findings and professional evaluation.  See Record at 38.  Dr. Smith thereafter obtained various records relating to Horan, reviewed them and conducted a psychiatric examination of Horan beginning in October, 1999.  See, e.g., Trial Tr. at 461-63.[3]

---

[2]  This portion of the Vehicle and Traffic Law relates to the duties of law enforcement agents to request that operators of motor vehicles involved in an accident exchange certain information with one another, including the operator's name, residence, insurance carrier and insurance identification information.  As is discussed *infra*, this count in the Indictment was eventually dismissed by the trial court as jurisdictionally defective with respect to Horan.

[3]  The record reflects that Dr. Smith was unable to fully complete his examination of Horan at that time, see Trial Tr. at 477-78, and he therefore scheduled a second examination of Horan that was conducted in December 1999.  Trial Tr. at 479.

On August 10, 1999, Horan's jury trial on the above-referenced charges commenced in Greene County Court before Judge Pulver.  At that trial, Roe testified as to what he observed concerning Horan's driving on June 10, 1999 as more fully described above.  Dr. Smith, who testified on behalf of the prosecution, conceded that Horan was suffering from a mental disease or defect on June 10, 1999.  Trial Tr. at 496.  In support of this conclusion, Dr. Smith testified that in the weeks prior to June 10, 1999, Horan was regularly "hearing the voices" of an individual named Beth, who had informed Horan that she "had taken over as queen of the country and was in control of the police and prisons."  Trial Tr. at 474.[4]  That individual informed Horan that she had recruited two former classmates of Horan, Chris and John, and turned one or both of them "into the Antichrist."  Trial Tr. at 474.   Horan informed Dr. Smith that those two men "were doing evil and... destroying the world."  Id.[5]

Dr. Smith testified that notwithstanding Horan's mental illness, on the day he killed DeWald, Horan: i) possessed the capacity to know or appreciate the nature and consequences of his actions; and ii) knew at that time that his conduct was wrong.  Trial Tr. at 496, 502.  In support of that determination, Dr. Smith noted that in his statement to the police, Horan had, *inter alia*: i) acknowledged that at the time of the incident, he knew that killing was both legally and morally wrong; ii) indicated that "doing evil meant hurting other people, doing bad stuff, the opposite of good and breaking the law;" iii) knew that his conduct was illegal; and iv) stated that he intentionally swerved to hit the victim.  Trial Tr. at 503.  The above statements, coupled with

---

[4]  Beth may have been a former classmate of Horan.  See Trial Tr. at 391.

[5]  Horan also advised Dr. Smith that at some point prior to the incident involving DeWald, Beth had become Horan's mother and "was going to drill holes in his head."  Trial Tr. at 474.

the fact that Horan possessed a "moment-by-moment awareness, at the time of the incident, of the events that were occurring in his environment surrounding him," Trial Tr. at 503, demonstrated to Dr. Smith that at the time Horan hit DeWald, he was able to appreciate the nature and consequences of his actions.  Trial Tr. at 504.

In presenting his defense to the charges against Horan, trial counsel called Dr. Robert Goldstein, a psychiatrist who had reviewed Horan's psychiatric history and had personally examined him prior to trial.  Trial Tr. at 383-85.  Dr. Goldstein testified that Horan's mental health records reflected that he had entered a psychiatric hospital for one month during his senior year in high school, and that he was unable to complete his second semester at college "because his mental health problems began to interfere with his ability to study."  Trial Tr. at 387.  Dr. Goldstein also testified that around the time of the incident, Horan suffered from paranoid schizophrenia and was experiencing "auditory hallucinations" which caused him to hear the voices of Beth, John and Chris.  Trial Tr. at 390-93.  Horan had informed Dr. Goldstein that before Petitioner entered his car on June 10, 1999, he had sent an e-mail to Jesus Christ in which Horan prayed for help regarding Beth, John and Chris.  Trial Tr. at p. 403.  In testifying as to what caused Horan to kill DeWald, Dr. Goldstein testified that after sending the e-mail to Jesus Christ, one of Horan's neighbors began driving his all terrain vehicle erratically.  Trial Tr. at 403, 475.  Horan interpreted his neighbor's actions as "a kind of signal that things were really coming to a head."  Trial Tr. at 403.  Soon thereafter, Horan:

> heard voices telling him to kill somebody, anybody, so he could
> save the world and he saw a figure at some point and time walking
> down the shoulder of the road and he intentionally, in response to
> these ideas that he had, in response to the perceptions he had,
> intentionally drove his car into this innocent person.

Trial Tr. at 404.  Toward the conclusion of his direct examination, defense counsel asked Dr.

Goldstein whether Horan could appreciate the nature of his conduct on June 10th and whether

such conduct was right or wrong.  Trial Tr. at 406.  Dr. Goldstein testified that "as a result of

[Horan's] psychotic, schizophrenic condition at that time... he was definitely unable to appreciate

the wrongfulness or nature of his conduct" at the time he killed DeWald.  Id.  Dr. Goldstein

further declared that Horan could not tell at that time that it was wrong or immoral to kill anyone.

Trial Tr. at 406-07.

Following rebuttal testimony in the form of testimony from Dr. Smith and closing

arguments of counsel, the trial court instructed the jury on the law applicable to Horan's case,

including law relating to his affirmative defense of legal insanity.[6]  See Trial Tr. at 662-77.  The

jury began its deliberations on the charges against Horan on March 7, 2000.  During the course of

those deliberations, Judge Pulver responded to several requests of the jury, which included a

request that the court re-instruct them as to what the prosecution was required to prove for Horan

to be found guilty of the murder charges.  Trial Tr. at 685-96.  The jury thereafter returned a

unanimous verdict in which it found Horan guilty of the intentional murder of DeWald.  Trial Tr.

at 697.  The jury also rejected Horan's insanity defense, indicating "no" on the question on the

verdict sheet as to whether the jury determined that Horan was not responsible for his actions by

reason of mental disease or defect.  Trial Tr. at 697-98.

On March 31, 2000, Horan appeared before Judge Pulver for sentencing.  At that

---

[6]  In its order dated March 1, 2000, the County Court dismissed the third count brought
against Horan in the Indictment after the court found that charge to be jurisdictionally defective.
See Record at 12-13.

proceeding, the County Court sentenced Horan to a term of twenty-five years to life imprisonment on the murder conviction.  See Transcript of Sentencing of Daniel Horan (3/31/00) ("Sentencing Tr.") at 32-33.

On November 1, 2000, Horan filed a collateral challenge to his conviction in the form of a motion to vacate his judgment of conviction which he filed with the County Court pursuant to New York's Criminal Procedure Law ("CPL"), Section 440.10 ("CPL Motion").  See App. at 440-54.  In that application, Horan argued that he received the ineffective assistance of trial counsel.  Id.  That motion was opposed by the district attorney, and in a Decision & Order dated March 19, 2001, Judge Pulver denied Horan's CPL Motion in its entirety.  See App. at 468-74 ("March, 2001 Order").

Horan also pursued a direct appeal of his conviction with the New York State Supreme Court, Appellate Division, Third Department.  In that appeal, Horan's appellate counsel argued that: i) the trial court did not ensure that Horan was competent to stand trial; ii) Horan's right to be present during all material stages of his trial was violated in the criminal matter below; iii) Horan received the ineffective assistance of trial counsel; and iv) the trial court improperly denied Horan's CPL Motion.  See Appellate Brief (8/27/01) ("App. Br.").  That appeal was opposed by the Greene County district attorney, and on January 31, 2002, the Appellate Division denied Horan's appeal, which included his appeal (by permission) of Judge Pulver's March 2001 Order.  See People v. Horan, 290 A.D.2d 880 (3d Dept. 2002).  On April 30, 2002, the Court of Appeals denied Horan's application for leave to appeal to that Court.  See People v. Horan, 98 N.Y.2d 638 (2002).

*B.  Proceedings in This Court*

Petitioner commenced this proceeding, through counsel, on April 21, 2003.  See Dkt. No.

1.  In his Petition, Horan asserts several theories in support of his ground alleging ineffective

assistance of trial counsel.  See Petition (Dkt. No. 1).  By Order filed May 2, 2003, United States

Magistrate Judge David E. Peebles directed the Respondent to file his response to the pleading,

see Dkt. No. 2, and on September 19, 2003, the Office of the Attorney General for the State of

New York, acting on Respondent's behalf, filed an Answer together with a memorandum of law

in opposition to Horan's Petition.  Dkt. Nos. 7-8.  Petitioner thereafter submitted a traverse in

further support of his habeas application.  See Dkt. No. 10.


## II. DISCUSSION

*A.  Standard of Review Applicable to Horan's Claim*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of the
> facts in light of the evidence presented in the State court
> proceeding."

Rodriguez v. Miller, 439 F.3d 68, 73 (2d Cir. 2006) (quoting 28 U.S.C. § 2254(d)); see also

DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005); Miranda v. Bennett, 322 F.3d 171, 177-78

(2d Cir. 2003).  "A state court adjudication is 'contrary to' clearly established federal law only if

'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'"  Rodriguez, 439 F.3d at 73 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  Under the "unreasonable application" clause of the AEDPA, a federal habeas court may only grant the writ where the state court's decision "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Rodriguez, 439 F.3d at 73 (quoting Williams, 529 U.S. at 413).

> *B.  Substance of Horan's Claim*

In light of the foregoing standards, this Court initially considers the clearly established Supreme Court precedent that governs Petitioner's claim alleging ineffective assistance.

### 1.  Clearly Established Supreme Court Precedent

The Sixth Amendment to the United States Constitution provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  To establish a violation of this right to the effective assistance of counsel, a habeas petitioner must show both: i) that counsel's representation fell below an objective standard of reasonableness, measured in the light of the prevailing professional norms; and ii) resulting prejudice that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688-90 (1984); Wiggins v. Smith, 539 U.S. 510, 521 (2003) ("the legal principles that govern claims of ineffective assistance of counsel" were

established in Strickland).[7]

### 2. Contrary To, or Unreasonable Application Of, Clearly Established Supreme Court Precedent

Although Horan has raised only one ground for relief in his federal habeas application, he has asserted numerous theories in support of that claim.[8]  This Court will therefore address the arguments raised by Horan in support of his ineffective assistance claim *seriatim*.

#### a. Failure to Consult With Horan and Call Certain Witnesses at His Trial

Horan initially claims that defense counsel failed to adequately consult with Horan.  See Petition (Dkt. No. 1) at 10.  Specifically, he argues that his attorney did not consult with him between June through September, 1999, and that during the trial itself, counsel only met with Horan on four occasions.  Id.  Petitioner further claims that both his mother and aunt possessed evidence relating to his mental condition immediately prior to and at the time of the incident involving DeWald, but that counsel wrongfully failed to interview those individuals prior to trial or call them as defense witnesses at that proceeding.  Petition (Dkt. No. 1) at 10-11.

"A petitioner's 'bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.'" Campbell v. Greene, 440 F. Supp. 2d 125, 149 (N.D.N.Y. 2006) (McCurn, Senior D.J.) (citing

---

[7]  In Williams, the Supreme Court declared that "the rule set forth in Strickland qualifies as 'clearly established Federal law[.]'"  Williams, 529 U.S. at 391.

[8]  Horan provided the argument in support of his ground for relief through a memorandum of law he attached to his Petition.  See Petition (Dkt. No. 1) at ¶ 12 and attached 4-19.

Atkinson v. United States, No. 05-CV-286, 95-CR-232(S2), 2005 WL 3555946, at *7 (N.D.N.Y.

Dec. 28, 2005) (McAvoy, Senior D.J.); Sheedy v. United States, No. 96-CV-1289, 1997 WL

394664, at *9 (N.D.N.Y. July 8, 1997) (Munson, Senior D.J.)) (other quotation and citations

omitted).  In the instant case, although Horan now faults counsel for not consulting with

Petitioner between June through September 1999, see Petition (Dkt. No. 1) at 10, this claim

appears to overlook the fact that in describing Horan's mental state prior to trial, Judge Pulver

noted:

> for a large portion of the time after defendant was arrested and
> before he stood trial he remained mute, refused to eat, drink or take
> his prescribed psychiatric drugs, and engaged in eccentric self-
> destructive behavior in his jail cell.  Ultimately, the
> aforementioned behavior caused [Horan's] relocation to Marcy
> Psychiatric Center where he was medicated and remained until he
> was medically, and later legally, determined to be competent to
> stand trial.[9]

March 2001 Order at 3.

Based upon Judge Pulver's factual findings noted above, which have not been refuted by

any – much less clear and convincing – evidence,[10] it does not appear to this Court as though it

was objectively unreasonable for defense counsel to refrain from consulting with Horan between

June and September 1999.  Additionally, significant by its omission from Horan's Petition is any

proof that his defense to the charges was compromised, in any way, by counsel's failure to

_____

[9] On January 19, 2000, based upon reports created by psychiatrists who had examined Horan after the initial finding of incompetency, both parties stipulated that Horan was competent to stand trial.  See Record at 26-27.

[10] In the context of habeas petitions, determinations of factual issues made by a state court "shall be presumed to be correct," and a petitioner is required to rebut this presumption by clear and convincing evidence.  Majid v. Portuondo, 428 F.3d 112, 125 (2d Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)); see also Mask v. McGinnis, 233 F.3d 132, 139 (2d Cir. 2000).

14

consult with Horan during that brief period of time.

Horan next faults his trial attorney because he did not call as defense witnesses Horan's mother or aunt. Petition at (Dkt. No. 1) at 10-11.[11]  The affidavits upon which Horan now relies in support of this aspect of his Petition allege that Horan was mentally impaired at the time he hit DeWald with his automobile. See App. at 455-67; see also Supplemental Record on Appeal at 37 (Horan claiming in affidavit that his mother and aunt "would have testified as to my condition...").  However, as Judge Pulver properly noted in denying this aspect of Horan's CPL Motion, "the fact that [Horan] suffered from a mental illness was never an issue in this case. Everyone, including the People, agreed that this was so."  March 2001 Order at 5.  Thus, as the County Court correctly concluded, the testimony of Petitioner's aunt and mother relative to this issue would have merely been cumulative of other evidence offered at trial by both the prosecution and the defense.[12]  March 2001 Order at 5.  Furthermore, Judge Pulver noted that defense counsel's decision to refrain from calling those individuals as defense witnesses may well have been rooted in defense counsel's trial strategy.  Specifically, the trial court noted that:

> defense counsel very likely felt that calling [Horan's] mother and aunt to testify as to [his] mental illness in addition to the [expert witnesses who testified about his mental illness at trial] would cause more harm than benefit to the defense.  Certainly, the two were interested witnesses and calling them to the stand would have exposed them to cross-examination.

---

[11]  Although Horan faults trial counsel for failing to both interview and/or call those witnesses at trial, it is clear that Petitioner could only demonstrate prejudice if counsel had wrongfully failed to call those witnesses at his trial.

[12]  A "trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."  Ayuso v. Artuz, No. 99 CIV 12015 AGS JCF, 2001 WL 246437, at *7 (S.D.N.Y. Mar. 7, 2001) (quoting Holmes, 44 F.3d at 1157) (other citations omitted).

15

March 2001 Order at 6.

In addressing this claim in the context of Horan's direct appeal, the Appellate Division found that "the record demonstrates a legitimate strategic explanation for counsel's decision... to not call lay witnesses on behalf of defendant." Horan, 290 A.D.2d at 885 (citation omitted).

Based upon the foregoing, this Court cannot conclude that the Appellate Division's decision denying this aspect of Horan's ineffective assistance claim is either contrary to, or represents an unreasonable application of, Strickland and its progeny. Therefore, this theory does not afford Horan a basis for habeas relief herein.

### b. Failure to File Pre-Trial Motions

Horan next claims that his trial counsel improperly failed to file any pre-trial motions in the criminal matter below. Petition (Dkt. No. 1) at 11. Specifically, he notes that counsel never moved to dismiss any counts in the Indictment prior to trial, including Count Three of that accusatory instrument (which was ultimately dismissed by the trial court *sua sponte*), and argues that trial counsel wrongfully failed to move to suppress the incriminating statement Horan provided to the police. Id. Petitioner also contends that he was never advised of the "factual and legal implications if such statements were to be admitted at trial." Id.

Although Petitioner correctly argues that trial counsel did not move to dismiss the third count in the Indictment, Horan cannot demonstrate that he was prejudiced by that failure of counsel because Judge Pulver *sua sponte* dismissed that charge before the commencement of Horan's trial. See, e.g., App. at 12-13. Thus, this theory does not warrant the granting of Petitioner's application.

Considering next trial counsel's failure to file any suppression motion, this Court notes

16

that both the trial court and the Appellate Division concluded that there was a legitimate, strategic explanation for counsel's decision to refrain from challenging the admissibility of Horan's incriminating statement.  See March 2001 Order at p. 4; Horan, 290 A.D.2d at 885. This Court agrees.  Although Horan's statement to law enforcement agents was clearly inculpatory – Horan admitted to intentionally killing DeWald (see Resp. App. at RA1-3) – the admissions he made to law enforcement agents in that statement also contained numerous comments that buttressed defense counsel's insanity defense to the charges.  Specifically, as noted above, in the incriminating statement which Petitioner now argues trial counsel wrongfully failed to move to suppress, Horan: i) claimed that he hit DeWald "to make the world be good;"  ii) declared that he had been lied to and brainwashed by various individuals (including "a devil worshiper") who were attempting to "t[ake] over the world;" iii) noted that after killing the victim he planned to commit suicide from the George Washington Bridge "[b]ecause [he] let Chris destroy the world;" and iv) stated that he had killed DeWald "[t]o save the world."  See Resp. App. at RA1-3.  Thus, as Judge Pulver sagely noted:

> defense counsel's failure to make a pre-trial motion can be strategically explained by his assertion of the insanity defense (i.e., defense counsel did not move to suppress [Horan's] statement because he wanted to utilize portions of such statement at trial as evidence supporting the insanity defense).  Therefore, the Court is not persuaded that this constitutes ineffective assistance of counsel.

March 2001 Order at 4 (citation omitted).

Since trial counsel would have been precluded from utilizing the above-referenced statement to the police – which supported the insanity defense counsel pursued at trial – if that statement was suppressed, Petitioner's counsel did not act in an objectively unreasonable manner

17

when he failed to seek the suppression of Horan's statement to law enforcement agents.

Finally, although Petitioner now contends that he was "unaware of the factual and legal implications" that the use of his incriminating statement would have with respect to his trial, see Petition (Dkt. No. 1) at 11, this claim appears to overlook the fact that Horan himself admitted in the affidavit he submitted in support of his CPL Motion that during trial counsel's initial consultation with Horan, he was informed by his attorney that he intended to pursue an insanity defense, see App. at 444, and counsel specifically advised Horan that the statement he made to law enforcement agents would be utilized by counsel at trial in conjunction with that defense. See App. at 449.

The failure to seek the suppression of an incriminating statement may be the product of sound trial strategy, rather than ineffective assistance.  See, e.g., United States v. Li, No. 98 CR. 713(DLC), 1999 WL 311818, at *6 (S.D.N.Y. May 18, 1999) (trial counsel "made a conscious, strategic decision not to seek suppression of the post-arrest statement prior to trial"), aff'd, United States v. Li, 205 F.3d 1326 (2d Cir. 2000).  Since the record establishes a strategic reason for counsel's failure to seek the suppression of the incriminating statement, the Appellate Division's decision which rejected this aspect of Horan's appeal is neither contrary to, nor represents an unreasonable application of, the above-referenced clearly established Supreme Court precedent.  Therefore, this Court cannot grant Horan's Petition on this theory.

### c.  Errors Committed During the Course of the Trial

Horan next cites various errors purportedly made by his counsel during the course of the criminal trial, including: i) a stipulation into which defense counsel entered with the prosecution;

18

ii) defense counsel's failure to object to the testimony provided by two prosecution witnesses; iii) trial counsel's failure to object to testimony of the victim's father; and iv) the introduction into evidence by the prosecution, without objection by defense counsel, of two photographs at Horan's trial.  See Petition (Dkt. No. 1) at 11-13.

Considering first Horan's claim regarding the stipulation into which the prosecution and defense counsel entered, the Court notes that prior to trial, the prosecutor and defense counsel stipulated that various facts could be received into evidence and read to the jury at Horan's trial. See App. at 417-18.  In that stipulation, counsel admitted on behalf of his client that on June 10, 1999, Horan intentionally steered his vehicle into the shoulder of the road and intentionally drove into the back of DeWald, causing her death.  See App. at 417; see also Trial Tr. at 221.  That stipulation also admitted that Horan provided the incriminating statement referenced above to law enforcement agents, including Horan's statement that he meant to kill the victim and he was a "cold blooded killer."  See App. at 417, 421; see also Trial Tr. at 221-22, 226.  Petitioner argues that by entering into that stipulation without his consent, trial counsel improperly admitted facts which established Horan's guilt of the second degree murder charge.  Petition (Dkt. No. 1) at 11-12.

However, the fact that Horan's counsel did not obtain Petitioner's consent to enter into the above-cited stipulation does not amount to *per se* ineffective assistance of counsel because "[e]ntering into a stipulation is a strategic decision that defense counsel may make on the defendant's behalf."  Goicochea-Melchor v. United States, No. 99 CIV. 729(JGK), 1999 WL 804146, at *5 (S.D.N.Y. Oct. 7, 1999) (citing Brown v. Artuz, 124 F.3d 73, 77 (2d Cir. 1997)) (other citation omitted); see also Salcedo v. United States, No. 98 CIV. 7638(DLC), 1999 WL

335835, at *3 (S.D.N.Y. May 25, 1999) ("[t]he strategic decision to enter into a stipulation is one that defense counsel may make on the defendant's behalf") (citing <u>Brown</u>).  In the context of habeas corpus proceedings, "strategic choices of trial counsel 'are virtually unchallengeable.'" <u>Bonneau v. Scully</u>, Nos. 86 Civ. 270(CSH), 86 Civ. 3901(CSH), 1991 WL 90739, at *1 (S.D.N.Y. 1991) (citing <u>Strickland</u>, 466 U.S. at 690-91), <u>aff'd</u>, 956 F.2d 1160 (2d Cir. 1992).  As Senior Judge Neal P. McCurn, of this District, has noted:

> [T]he habeas court will not second-guess trial strategy simply because the chosen strategy has failed... especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial.

<u>Campbell</u>, 440 F. Supp. 2d at 150 (quoting <u>Nieves v. Kelly</u>, 990 F. Supp. 255, 264 (S.D.N.Y. 1997)) (other citations and internal quotations omitted).   Thus, where counsel's decision to enter into a stipulation – even absent his client's consent – is objectively reasonable, a claim alleging ineffective assistance of counsel on that basis must be denied.  <u>Goicochea-Melchor</u>, 1999 WL 804146, at *5.

In the criminal matter below, it is clear that the defense counsel's conduct in entering into the above-referenced stipulation was objectively reasonable.  As Judge Pulver noted in rejecting this aspect of Horan's ineffective assistance claim, counsel's decision to enter into the stipulation:

> can be explained by defense counsel's strategic decision to present one defense of not responsible for an intentional act due to mental disease or defect rather than present this defense *in conjunction* with the contradictory defense of not guilty due to accidental conduct.  The decision not to present alternative, contradictory defenses was a tactical decision by defense counsel, presumably designed to enhance the defense's credibility with the jury.

20

March 2001 Decision at 4 (emphasis in original)

In light of defense counsel's strategic decision to pursue the defense of not guilty by reason of mental disease or defect, counsel's decision to enter into the above-cited stipulation, which included admission into evidence of Horan's statement to law enforcement agents wherein he claimed that he intentionally hit DeWald "because Chris [] and John took over the world," and "[t]o save the world," see Resp. App. at RA1-3, was objectively reasonable. Additionally, as the Appellate Division properly noted, there was "overwhelming proof" that Horan committed the crime. See Horan, 290 A.D.2d at 885. That fact establishes that Petitioner was not prejudiced by counsel's conduct.

Petitioner next faults defense counsel because he failed to object to the testimony provided by two police officers who testified for the prosecution, as well as testimony offered by the victim's father at Petitioner's trial. See Petition (Dkt. No. 1) at 12. However, Horan has not offered any basis upon which trial counsel could have properly objected to the testimony of either of the police officers whom he referenced in his Petition. Furthermore, this Court's review of their testimony reveals that such witnesses had personal knowledge of facts germane to the charges against Horan and were therefore properly permitted to testify against Horan. See Trial Tr. at 264-82. As to the testimony of Lawrence DeWald, the victim's father, Petitioner has failed to establish how the admission of that evidence was improper in any way.

Petitioner next objects to the admission into evidence of two photographs at the criminal trial below.[13] One of these photographs depicted DeWald with family members several months before she was killed, while the other depicted her soon after being struck by Horan's vehicle.

---

[13] Those photographs were supplied to and reviewed by this Court.

Horan argues that "[b]oth photographs, despite their inflammatory and prejudicial nature, were admitted without objection of defense counsel."  Petition (Dkt. No. 1) at 13.

With respect to the photograph depicting DeWald after she was struck by Horan, the Court notes that defense counsel specifically indicated on the record that he had seen the photograph and that he had no objection to its admission into evidence.  Trial Tr. at 234.  It would be unreasonable for this Court to assume that counsel specifically reviewed the photograph, believed it to be inflammatory, unduly prejudicial or otherwise objectionable, but nevertheless declined to object to its admission into evidence.  Furthermore, the trial court specifically advised the jury that it had determined the photograph to be relevant vis-a-vis the charges brought against Horan, Trial Tr. at 234-35, and cautioned the jury to view the photograph "quickly, calmly and unemotionally."  Trial Tr. at 235.

As to the admission of the photograph of the victim in the company of her family, since there is no evidence that the admission of that photograph was likely to appeal to the jury's sympathy or otherwise unduly prejudice Horan, it appears to this Court as though that photograph could also be properly admitted into evidence.  See, e.g., Knoesel v. Duncan, No. 03-CV-2792(SLT), 2006 WL 2524198, at *15 n.2  (E.D.N.Y. Aug. 30, 2006).  Moreover, as with the other photograph upon which this aspect of Horan's Petition is based, defense counsel specifically viewed that picture before the prosecutor sought to admit it into evidence and failed to lodge any objection, see Trial Tr. at 305, a fact that supports the proposition that the photograph could properly be received into evidence.

Finally, this Court notes that in its final instructions to the jury, the trial court specifically instructed the jury to view the photographs that were received into evidence "objectively, and

22

without emotion and without prejudice."  Trial Tr. at 642.  The jury is presumed to have followed

this instruction.  See Smith v. Barkley, No. 99-CV-0257, 2004 WL 437470(GLS), at *4 n.4

(N.D.N.Y. Feb. 18, 2004) (Sharpe, D.J.) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000);

Shariff v. Artuz, No. 97CIV.2882 (RCC JCF), 2001 WL 135763, at *3 (S.D.N.Y. Feb. 16, 2001))

(other citation omitted).

    Based upon the above, this Court concludes that the Appellate Division's decision

denying this aspect of Horan's appeal, see Horan, 290 A.D.2d at 884-85, is neither contrary to,

nor represents of an unreasonable application of, Strickland and its progeny.  Therefore, this

theory does not afford Horan a basis for habeas relief herein.

### d. Expert Witness Testimony

    Horan next faults trial counsel because: i) counsel called only two psychiatrists to testify

for the defense; and ii) prior to trial, counsel allowed Horan to be questioned by the prosecution's

expert witness about contradictions and inconsistencies he made in statements he provided to law

enforcement agents.  Petition (Dkt. No. 1) at 13-15.

    Petitioner has not established that the expert witnesses utilized by the defense were

unprepared for the trial or that their testimony failed to support Horan's insanity defense.  To the

contrary, the record reflects that the testimony of both expert witnesses called by the defense

assisted Horan's insanity defense.  Specifically, Dr. C. Aldrich testified that, based upon his

review of Horan's mental health records and the doctor's examination of Horan, he: i) appeared

at times to be "grossly psychotic" (Trial Tr. at 324); ii) had "act[ed] very bizarrely, strangely"

while in jail (Trial Tr. at 324); iii) expressed his belief that he was "one billion years old" (Trial

Tr. at 326); iv) had two siblings who suffered from psychiatric disorders (Trial Tr. at 338-39); v) engaged in a "ritualistic" conversation with himself while in jail (Trial Tr. at 348); and vi) suffered from schizoaffective disorder, which caused him to become delusional, confused and depressed (Trial Tr. at 353).  The substance of Dr. Goldstein's testimony regarding Horan's mental health which is discussed more fully above ultimately led that witness to conclude that on the day Petitioner killed DeWald, he could not appreciate the wrongfulness or nature of his conduct, and that he was unaware of the fact that it was wrong or immoral to kill anyone.  Trial Tr. at 406-07.  Horan has wholly failed to demonstrate that these witnesses did not adequately support Horan's defense that he was not guilty of the crimes charged in the Indictment due to a mental disease or defect, or that additional witnesses would have provided more beneficial testimony on behalf of the defense.

     "The Second Circuit has emphasized that a court 'will practically never second-guess' an attorney's decision to present or withhold a witness."  Arkin v. Bennett, 282 F. Supp. 2d 24, 38 (S.D.N.Y. 2003) (quoting United States ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974)); see United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) (decision whether to call witnesses "fall[s] squarely within the ambit of trial strategy, and, if reasonably made, cannot support an ineffective assistance claim") (internal quotation and citation omitted); Collier v. United States, 92 F. Supp. 2d 99, 103 (N.D.N.Y. 2000) (McAvoy, D.J.) ("[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial) (citing United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992)) (internal quotation omitted).  Horan's unsupported claim that trial counsel did not adequately present a defense to the charges against

Horan through additional expert (or lay) witnesses does not afford this Court a basis to grant Horan the relief he requests herein.[14]

As to the testimony of prosecution witness Dr. Kevin Smith, the fact that such witness might have questioned Horan about inconsistencies in his pre-trial statements did not form a basis upon which the trial court could have precluded that expert witness – who examined Horan prior to trial for the purpose of determining whether he should be held criminally accountable for his conduct – from testifying at trial.[15]  Moreover, as the Appellate Division noted, defense counsel succeeded in eliciting testimony from Dr. Smith that Horan was, in fact, suffering from a mental illness at the time he committed the crimes charged in the Indictment (see Trial Tr. at 496; see also Horan, 290 A.D.2d at 885 n.4) – a fact that clearly supported the insanity defense to the charges.

Since the record establishes that the defense presented expert testimony supporting the insanity defense and skillfully cross-examined prosecution witnesses in a manner that buttressed that defense, this Court finds that the Appellate Division's decision which rejected the aspect of Horan's appeal challenging trial counsel's conduct in this regard is not contrary to, or indicative of an unreasonable application of, the above-referenced clearly established Supreme Court precedent.  Therefore, Horan cannot prevail on this theory.

---

[14]  It is noteworthy that the Appellate Division concluded that trial counsel "investigated and cogently presented the insanity defense on defendant's behalf [and] skillfully cross-examin[ed] the People's witnesses to bring out facts in support of the insanity defense." See Horan, 290 A.D.2d at 885 & n.4.

[15]  Defense counsel objected on several occasions to questions asked of that witness by the prosecutor.  See Trial Tr. at 451, 458, 484, 494 and 504.

*e.  Motion for Mistrial*

Petitioner next faults counsel for presenting an untimely motion for a mistrial in light of Dr. Smith's allegedly improper questioning of Horan prior to trial.  See Petition (Dkt. No. 1) at 15.

Although the trial court denied the mistrial application made by defense counsel as untimely filed,[16] Judge Pulver also addressed the substance of that motion.  Specifically, the County Court noted that it was "not persuaded that Dr. Smith's actions... constituted a violation of CPL 250.10(3)[17] and, even if it were a violation, did not "so permeate the jury's verdict that setting it aside is appropriate."  See Record at 72.

"[P]rior to declaring a mistrial, the court must properly explore the appropriate alternatives to a mistrial."  Maynard v. Wait, 246 A.D.2d 853, 854-55 (3d Dep't 1998) (citing Hall v. Potoker, 49 N.Y.2d 501 (1980)); see also Cooper v. Costello, No. 93-CV-5670(JG), 1996 WL 1088929, at *4 (E.D.N.Y. July 23, 1996) ("[a] mistrial is appropriate only in cases where the ends of justice might otherwise be defeated").[18]  As the Court noted in Wilson v. Chesworth, 96 A.D.2d 742 (4th Dep't 1983), "[b]efore declaring a mistrial in a criminal action it is incumbent upon a trial court to explore appropriate alternatives and to abort the trial only as a last resort."

---

[16]  Defense counsel filed the mistrial motion after the jury returned its verdict against Horan.  See, e.g., Record at 69.

[17]  CPL § 250.10(3) discusses the procedure by which the prosecution may properly conduct a pre-trial examination of a criminal defendant who intends to pursue an insanity defense to a crime.

[18]  A  trial court's determination of whether to declare a mistrial is accorded "the highest degree of respect."  Arizona v. Washington, 434 U.S. 497, 510-11 (1978).

Wilson, 96 A.D.2d at 742 (citing People v. Michael, 48 N.Y.2d 1 (1979); other citations omitted).

In light of all of the evidence adduced at trial, as well as the trial court's findings that: i) Dr. Smith's actions did not amount to a violation of the CPL and ii) even if such a violation occurred, the court would not set aside the verdict because any such violation did not permeate the jury's verdict, Petitioner cannot establish that he was prejudiced by the fact that counsel's motion for a mistrial was untimely.[19]  Thus, he is not entitled to habeas relief on this theory.

### f.  Statements Made During Sentencing

In his final theory in support of his claim that trial counsel rendered ineffective assistance, Horan argues that during the victim impact portion of Horan's sentencing proceeding, several witnesses, including the victim's father, offered "inflammatory, prejudicial" statements to which Horan's counsel offered "little objection."  Petition (Dkt. No.1 ) at 15-16.  These claims mirror the arguments raised by counsel in his appellate brief.  See App. Br. at 64-65.

Initially, it is patent that any misconduct on the part of trial counsel after the jury's verdict could not affect, in any way, the jury's determination that Horan was guilty of the second degree murder conviction.

Moreover, the Court notes that trial counsel objected on two separate occasions during the victim impact portion of Horan's sentencing, however both of those objections were overruled by the trial court.  See Sentencing Tr. at 14, 17.  It is unclear to this Court why Horan

---

[19]  To prevail on his motion for a mistrial, defense counsel was required to establish the existence of  "an error or legal defect in the proceedings... which [was] prejudicial to [Horan] and deprive[d] him of a fair trial."  See CPL § 280.10(1).

now argues that his sentence might have been different if defense counsel had either lodged those objections earlier during the course of his sentencing hearing, or if counsel had lodged more frequent objections during that proceeding.  Thus, it appears to this Court as though this aspect of Horan's Petition is premised upon nothing more than rank speculation.  Unfortunately for Petitioner, courts cannot grant habeas relief based upon unsubstantiated conclusions, opinions or speculation.  Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"); see Osinoiki v. Riley, CV-90-2097(RR), 1990 WL 152540, at *2-3 (E.D.N.Y. Sept. 28, 1990) (conclusory statements based on speculation "are inadequate to satisfy petitioner's burden") (citing Machibroda v. United States, 368 U.S. 487, 495 (1962); Dory v. Comm'r of Corr., 865 F.2d 44, 45 (2d Cir.1989) (per curiam)) (other citations omitted); see also Williams v. Burge, No. Civ.A.9:02CV0695(DNH), 2005 WL 2179423, at *16 (N.D.N.Y. Aug. 15, 2005) (Peebles, M.J.), adopted by, No. 02-CV-0695, Dkt. No. 35 (N.D.N.Y. Dec. 7, 2005) (Hurd, D.J.); Franza v. Stinson, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999).

Based upon the foregoing, the Court finds that Horan's final theory in support of his ground alleging ineffective assistance is without substance.  *A fortiori*, Petitioner has failed to demonstrate that the Appellate Division's decision denying this aspect of Petitioner's appeal is either contrary to, or represents an unreasonable application of, Strickland and its progeny.  Therefore, this final theory does not afford Horan a basis for habeas relief.

### III. Certificate of Appealability

Finally, the Court notes that 28 U.S.C. § 2253(c) provides in relevant part that:

28

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court....[20]

28 U.S.C. § 2253(c)(1)(A).  A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  Since Petitioner has failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

## IV. CONCLUSION

**WHEREFORE**, after having reviewed the State Court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

**ORDERED**, that Horan's Petition (Dkt. No. 1) is **DENIED** and **DISMISSED**; and it is further

**ORDERED**, that any State Court records that were not filed in this action be returned directly to the Attorney General at the conclusion of these proceedings (including any appeal of this Memorandum-Decision and Order filed by any party); and it is further

---

[20]  Rule 22 of the *Federal Rules of Appellate Procedure* also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  See FED. R. APP. P. 22(b).

**ORDERED**, that the Clerk of Court serve a copy of this Memorandum-Decision and Order upon the parties to this action.

**IT IS SO ORDERED.**

DATED:        March 09, 2007
              Albany, New York

_____
        Lawrence E. Kahn
        U.S. District Judge